AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1655 Thomas Avenue in Columbus, Ohio 43223 | )<br>)<br>)<br>)<br>)<br>)    Case No. 2:21-mj-342 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
This affidavit is made to support an application for a warrant to search and seize evidence from the premise commonly known as 1655 Thomas Avenue in Columbus, Ohio 43223. The premise is a two-story, tan single family residence with white trim. There are two doors both painted white and facing east. The northernmost door is identified by the black numerals "1655". The premise located at 1655 Thomas Avenue in Columbus, Ohio 43223, will hereafter be referred to as the TARGET LOCATION.

located in the    __Southern__    District of    __Ohio__    , there is now concealed *(identify the person or describe the property to be seized):*
Property that constitutes evidence of the commission of and/or property designed or intended for use or which is or has been used as a means to commit criminal offenses as described in Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:

**See Attached Affidavit**

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DEA Special Agent Christopher Cadogan
*Printed name and title*

Sworn to before me and signed in my presence.

Date: S-18-21

*Judge's signature*

City and state: Columbus, Ohio

Chelsey M. Vascura, U.S. Magistrate Judge

1    **AFFIDAVIT**

2

3

4

5    **Christopher Cadogan**, being first duly sworn, deposes and says:

6

7    **EXPERIENCE OF SPECIAL AGENT**

8            1.      Your Affiant is a Special Agent with the Drug Enforcement Administration

9    (DEA) and has been so employed for approximately twenty-four years. I am currently assigned to

10   Group 4 of the DEA's Columbus, Ohio District Office. This group is currently comprised of narcotics

11   investigators from the DEA and the Columbus Police Department (CPD). Group 4 was designed, in

12   part, to target individuals and groups involved in the manufacture and distribution of

13   methamphetamine, cocaine, and heroin in Franklin County, Ohio. Prior to being employed by the

14   DEA, I was employed for approximately two and one-half years as a United States Border Patrol

15   Agent. As a Border Patrol Agent I was cross-designated to make federal arrests of individuals in

16   violation of Title 21 of the United States Code. For more than twenty-six years, I have had the

17   authority to make federal drug arrests.

18           2.      As a DEA Special Agent, Your Affiant has participated in hundreds of narcotics

19   investigations involving various types of controlled substances. I have received substantive advanced

20   training pertaining to the investigation of various crimes which arise from narcotics trafficking,

21   including money laundering, the use of interstate transportation in the furtherance of narcotics

22   trafficking, the use of the United States Postal Service facilities in furtherance of narcotics trafficking,

23   and the use of telecommunications facilities in the furtherance of narcotics trafficking. I have

24   participated in investigations involving the purchase of controlled substances from suspected narcotics

25   traffickers using both undercover narcotics investigators and confidential sources. I have participated

26   in the drafting and execution of search warrants for narcotics, proceeds from the sale of narcotics,

1

1  documentary evidence of narcotics trafficking, and for the telecommunications devices used by
2  narcotics traffickers. I have conducted surveillances in connection with narcotics investigations. I
3  have authored five affidavits supporting federal wire and electronic intercepts of known and suspected
4  narcotics traffickers.

5       **3.** Through the course of these investigations, I have personally interviewed
6  confidential sources and other persons involved in the distribution of illegal narcotics. I have also
7  interviewed persons arrested for the distribution of illegal narcotics. I have spoken with more
8  experienced narcotics investigators with whom I have worked concerning the practices of narcotics
9  traffickers and the best investigative methods to use when conducting investigations of narcotics
10  trafficking organizations. Through the course of my investigations and through my conversations with
11  more experienced narcotics investigators, I have become familiar with the methods and means utilized
12  by persons who participate in the illegal distribution of controlled substances.

13

14                    **PURPOSE OF AFFIDAVIT**

15       **4.** This affidavit is made to support an application for a warrant to search and seize
16  evidence from the premise commonly known as 1655 Thomas Avenue in Columbus, Ohio 43223.
17  The premise is a two-story, tan single family residence with white trim. There are two doors both
18  painted white and facing east. The northernmost door is identified by the black numerals "1655".
19  The premise located at 1655 Thomas Avenue in Columbus, Ohio 43223, will hereafter be referred to
20  as the TARGET LOCATION.

21       **5.** Based upon the information below, I have probable cause to believe that inside
22  the location described in paragraph 4, there is property that constitutes evidence of the commission of
23  a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and
24  property designed or intended for use or which is or has been used as a means of committing a
25  criminal offense. Specifically, I have probable cause to believe that within the above mentioned

1    property there is evidence of violations of Title 21, U.S.C. 841, Possession With Intent Distribute a

2    Controlled Substances (methamphetamine).

3           6.    The evidence to be searched for and seized is:

4           A.    methamphetamine, and any other controlled substances;

5           B.    documents and other items tending to show dominion and control over the

6    premises, including, but not limited to, bills or other business-related documents, correspondence,

7    photographs;

8           C.    documents or other items tending to identify co-conspirators and sources,

9    including, but not limited to, letters, notes, memoranda, photographs, address and phone books, maps,

10    organizers, or lists of names;

11           D.    items commonly used to facilitate drug trafficking, such as firearms,

12    ammunition, beepers, pagers, cellular telephones, pay/owe sheets, packaging materials, "cut", scales,

13    grinders;

14           E.    likely proceeds of drug trafficking, such as U.S. currency and other negotiable

15    instruments;

16           F.    documents and other items tending to establish or hide the whereabouts of

17    proceeds from drug trafficking, such as safes, keys to other locations, and financial records;

18           7.    The following is either the result of my own investigation or was provided to

19    me by other law enforcement officers. Unless specifically quoted, the conversations described below

20    are set forth in substance.

21                     **FACTS SUPPORTING PROBABLE CAUSE**

22           8.    Following a series of telephone calls and text messages between a DEA

23    confidential source, hereafter referred to as the CS, and known methamphetamine and fentanyl

24    distributor Dalton Ray FANNIN, arrangements were made for DEA Special Agent (SA) Antonio

25    Kelly, acting in an undercover capacity, to meet with FANNIN sometime before noon on April 8,

26    2021. The purpose of the meeting was for SA Kelly to purchase four (4) ounces of

1    methamphetamine from FANNIN. According to the CS, FANNIN had agreed to sell SA Kelly four

2    (4) ounces of methamphetamine for $2,400.00 in U.S. currency. According to the CS, FANNIN, AKA

3    "Larry", advised the CS to have his/her business associate (SA Kelly) contact him once he was "in

4    town and ready to go" on FANNIN's cellular telephone, telephone number (845) 269-2089. The CS

5    has, in the past, provided DEA with information which was later corroborated through independent

6    investigation. The CS is considered to be reliable.

7           9.     On April 8, 2021, plans were formulated at the DEA's Columbus District Office

8    for DEA Special Agent (SA) Antonio Kelly to meet with FANNIN later that day, for the purpose of

9    purchasing four (4) ounces of methamphetamine.

10         10.    On April 8, 2021, SA Kelly was provided with $2,400.00 in official advanced

11    funds (OAF) with which to purchase the purported methamphetamine. SA Kelly was also equipped

12    with a digital recording device in order to record the anticipated conversation between SA Kelly and

13    FANNIN. In addition to the recording device, SA Kelly was equipped with two transmitting devices

14    which were subsequently monitored by DEA Task Force Officer (TFO) Kevin Wangler over his

15    cellular telephone and Your Affiant over a police radio.

16         11.    On April 8, 2021, at approximately 11:00 a.m., DEA TFOs Bryan Mason

17    and Brian Daron established surveillance of FANNIN's residence located at 370 Whitethorne Avenue.

18         12.    At approximately 11:17 a.m., FANNIN texted SA Kelly and advised him that he

19    (FANNIN) was not yet in possession of the methamphetamine that he had earlier agreed to sell SA

20    Kelly. According to FANNIN, his source was currently in court.

21         13.    At approximately 11:27 a.m., the CS contacted Your Affiant and advised him

22    that FANNIN had advised the CS that FANNIN's source was still in court but that it shouldn't be too

23    much longer. According to the CS, FANNIN had advised the CS that he (FANNIN) was expecting to

24    hear from his source very soon.

1         14.    At approximately 12:33 p.m., the CS advised Your Affiant that FANNIN was in

2    possession of the methamphetamine and was now ready to meet with SA Kelly. Moments later,

3    FANNIN confirmed that he was ready in a text to SA Kelly. However, the investigators on

4    surveillance had not observed any arrivals or departures from FANNIN's residence located at 370

5    Whitethorne Avenue that would indicate that FANNIN had received a shipment of methamphetamine.

6         15.    At approximately 12:39 p.m., TFO Mason observed FANNIN exit the house

7    located at 370 Whitethorne Avenue wearing black pants and no shirt.

8         16.    At approximately 12:40 p.m., TFO Daron observed FANNIN go back inside his

9    residence.

10         17.    At approximately 12:44 p.m., the CS advised Your Affiant that FANNIN was

11    utilizing a different source of supply because FANNIN was unable to get ahold of his regular source of

12    supply. Investigators now suspected that the shipment had not yet been delivered.

13         18.    At approximately 12:45 p.m., TFO Mason observed a shirtless FANNIN exit his

14    residence while speaking on a cellular telephone. According to TFO Mason, FANNIN looked north

15    along Whitethorne Avenue before then going back inside the house.

16         19.    At approximately 12:47 p.m., Your Affiant and TFO Wangler observed SA

17    Kelly depart a pre-designated staging area and head towards Whitethorne Avenue.

18         20.    At approximately 12:55 p.m., TFOs Mason, Daron, Wangler, and Your

19    Affiant observed SA Kelly arrive and park on the west side of Whitethorne Avenue across the street

20    from FANNIN's residence.

21         21.    At approximately 1:08 p.m., FANNIN reaches out to SA Kelly via a text

22    message and apologizes for the delay and advises SA Kelly that his supplier should be arriving any

23    minute.

24         22.    At approximately 1:11 p.m., TFO Mason observed a black 2009 Mitsubishi

25    Eclipse, bearing Ohio license plate JER7204, registered to Decoda CARR at 673 Duncan Road in

1     Lucasville, Ohio 45648, arrive and park in front of FANNIN's residence on the west side of

2     Whitethorne Avenue, directly in front of SA Kelly's vehicle. The driver of the black Eclipse was

3     subsequently identified as Ryan Keith MOORE. It was also subsequently learned that an unidentified

4     white female was seated in the front passenger seat of the Eclipse and a white male juvenile, who was

5     later identified as MOORE's son, was seated in the rear passenger seat of the Eclipse. At this time,

6     both of the passengers were not yet unobserved by investigators.

7         23.    At approximately 1:11 p.m., TFOs Daron and Mason observed a bare chested

8     FANNIN, now wearing blue jeans, depart his residence located at 370 Whitethorne Avenue and walk

9     towards the Eclipse before then turning around and walking back into his house.

10        24.    At approximately 1:12 p.m., TFOs Daron and Mason observed FANNIN again

11    depart his residence and walk up to the open front passenger side window of the Eclipse. TFO Daron

12    subsequently observed the white female adult seated in the front passenger seat. SA Kelly also

13    observed that FANNIN reached into his back left pocket and pulled out a small digital scale as he

14    leaned into the front passenger side window of the Eclipse.

15        25.    At approximately 1:17 p.m., TFO Daron observed FANNIN walk from the

16    Eclipse to SA Kelly's vehicle that was parked directly behind (to the north of) the black Eclipse.

17    According to TFO Daron, FANNIN appeared to be carrying something in his hand as he walked

18    towards SA Kelly's vehicle. According to SA Kelly, FANNIN was carrying the bag containing the

19    purported methamphetamine, covered by a purple cloth, in his hand as he approached the undercover

20    vehicle.

21        26.    Moments later, TFO Daron subsequently observed FANNIN get into the front

22    passenger seat of SA Kelly's vehicle.

23        27.    At approximately 1:19 p.m., TFO Daron observed FANNIN get out of SA

24    Kelly's undercover vehicle and walk back to the Eclipse. TFO Daron subsequently observed FANNIN

25    hand something to someone inside the Eclipse through the open front passenger side window.

1            28.    At approximately the same time, TFO's Daron and Mason observed SA Kelly

2  depart the area in the undercover vehicle.

3            29.    According to SA Kelly, once inside the vehicle, FANNIN handed him

4  approximately 143.6 gross grams of a white crystalline substance, purported to be methamphetamine,

5  which was contained inside a clear plastic bag. According to SA Kelly, he subsequently handed

6  FANNIN the $2,400.00 in OAF as payment for the suspected methamphetamine.

7            30.    At approximately 1:21 p.m., TFOs Mason and Daron observed FANNIN walk

8  away from the Eclipse and return to his residence. At approximately the same time, the same above

9  listed investigators observed MOORE, the white female, and the juvenile depart the area in the black

10  Eclipse travelling south on Whitethorne Avenue. By this time, investigators could tell that a white

11  female adult was seated in the front passenger seat of the Eclipse. However, investigators were not yet

12  aware of the male juvenile in the backseat.

13            31.    Surveillance was maintained on MOORE and the black Mitsubishi Eclipse after

14  it departed the area.

15            32.    At approximately 1:22 p.m., DEA TFO David Barrick observed the Eclipse stop

16  and the unidentified white female get out on the northwest corner of the intersection of Clarendon

17  Avenue and Amherst Avenue in Columbus, Ohio. According to TFO Barrick, the white female had

18  blonde hair and was wearing a black top and gray checkered pants. According to TFO Barrick, she

19  walked northwest and subsequently disappeared from view. After dropping off the white female, the

20  Eclipse continued north on Clarendon Avenue and then east on Springmont Avenue.

21            33.    At approximately 1:27 p.m., TFO Mason observed the Eclipse stop and park in

22  the front yard of 1655 Thomas Avenue in Columbus, Ohio. According to TFO Mason, he observed

23  MOORE get out of the Eclipse carrying a black and yellow satchel that was strapped across his chest.

24  TFO Mason subsequently observed MOORE knock on one of the doors facing east and leading

25  into the house located at 1655 Thomas Avenue.

1            35.     At approximately 1:34 p.m., TFO Mason observed a gray 2008 Ford Edge,

2    bearing Ohio license plate JFX9060, registered to Alejandro MANCERA at 1655 Thomas Avenue in

3    Columbus, Ohio 43223 (TARGET LOCATION), arrive and park in the front yard of the TARGET

4    LOCATION, next to the Eclipse. After the Ford Edge arrived, TFO Mason observed MOORE get out

5    of the Eclipse with the black and yellow satchel strapped to his chest. MOORE had apparently

6    returned to his Eclipse unobserved after having been seen knocking on the door to the TARGET

7    LOCATION earlier. TFO Mason subsequently observed the driver of the Edge, a medium

8    complexioned white male, possibly Mexican, and MOORE walk up together to the TARGET

9    LOCATION. According to TFO Mason, the as yet unidentified driver of the Edge used a key to enter

10   the TARGET LOCATION with MOORE.

11           36.     At approximately 1:37 p.m., TFO Mason observed both the unidentified driver

12   of the Edge and MOORE exit the house together and then depart the area in their respective vehicles.

13   Surveillance was maintained on the Eclipse after it departed 1655 Thomas Avenue.

14           37.     The Eclipse was subsequently surveilled to the Marathon gas station located at

15   1401 Sullivant Avenue in Columbus, Ohio 43223 where MOORE was observed conducting what

16   appeared to be several hand to hand drug transactions. Columbus Police Department (CPD) patrol

17   officers eventually stopped MOORE at 1536 West Broad Street in Columbus, Ohio for failing to

18   signal in violation of Columbus City Traffic Code (CTC) 2131.14A. During the stop, officers learned

19   that MOORE was driving with an expired Ohio driver license in violation of CTC

20   2141.12A1. Officers also glimpsed what appeared to be illicit drugs inside the partially unzipped

21   black and yellow satchel that had been previously observed strapped to MOORE. It was also learned

22   that the Eclipse was occupied by a juvenile white male whom MOORE would later say was "probably"

23   his son. During a subsequent probable cause search of the satchel and the Eclipse, investigators

24   subsequently discovered nearly one (1) pound of suspected methamphetamine, several ounces

25   of suspected fentanyl, suspected drug proceeds, and a Glock 45, 9mm semi-automatic

1   pistol. The suspected drugs, the suspected drug proceeds, and the Glock 45 were all seized and

2   MOORE arrested on federal drug and gun charges.

3          38. SA Cadogan conducted a presumptive field test from a sample taken from the

4   suspected methamphetamine that was discovered in MOORE's possession. The sample subsequently

5   tested positive for the presence of methamphetamine. This presumptive field test was witnessed by

6   TFO Kevin Wangler.

7          39.     MOORE was subsequently advised of his rights as they pertain to the "Miranda

8   Decision". MOORE agreed to waive his rights and speak with investigators. MOORE stated that the

9   suspected white crystalline substance which tested positive for the presence of methamphetamine was

10   in fact methamphetamine, and the white powder believed to be fentanyl was in fact fentanyl.

11   According to MOORE, the pills in his possession were Percocet pills. MOORE also stated that earlier

12   in the day, just prior to his arrest, he had obtained the Percocet pills from a tall Hispanic Male in the

13   area of Thomas Avenue and Catherine Street. Investigators knew that the area that MOORE was

14   describing was the TARGET LOCATION. MOORE described the Hispanic male as 6'0" tall with

15   tattoos on his arms. This description closely matched the driver of the Ford Edge. According to

16   MOORE, the Hispanic male worked for a Mexican drug trafficker known as "Cali".

17          40.     MOORE stated that he believes "Cali" is in charge of a Mexican Drug

18   Trafficking Organization (DTO) operating out of Columbus, Ohio. According to MOORE, he has, in

19   the past, purchased pounds of Methamphetamine from this DTO. However, according to MOORE,

20   the DTO was currently awaiting a shipment of drugs and was out of methamphetamine. MOORE

21   stated that he normally uses "Cali's" DTO but had to purchase the methamphetamine he was found in

22   possession of from a white male known as "Chad", as a result of "Cali" being out of "product".

23          41.     On May 18, 2021, at approximately 11:15 a.m., DEA special agents and task

24   force officers established surveillance of the TARGET LOCATION. At approximately 1:20 p.m.,

25   investigators observed a thin young white male covered in tattoos walking north toward the TARGET

1   LOCATION from the direction of Mound Street. This white male was subsequently identified.

2   However, he will be listed here as a source of information (SOI).

3          **42.**    TFO Mason subsequently observed the SOI speaking with one of the young

4   Hispanic males residing at the TARGET LOCATION before the Hispanic male escorted him into the

5   TARGET LOCATION.

6          **43.**    At approximately 1:40 p.m., TFO Mason observed the second Hispanic male

7   believed to reside inside the TARGET LOCATION arrive and walk into the TARGET LOCATION.

8          **44.**    At approximately 1:47 p.m., TFO Mason observed the SOI depart the TARGET

9   LOCATION and subsequently walk west on Thomas Avenue.

10         **45.**    At approximately 1:55 p.m., TFO Jacob Smith and SA Zachary Bennett

11   conducted a consensual non-seizure contact of the SOI in the area of Edwin Street and Safford Avenue

12   as he/she was walking north toward Mound Street.

13         **46.**    TFO Smith asked for and received consent from the SOI to search his/her

14   person and belongings for weapons and controlled substances. A subsequent search of the SOI

15   revealed that he/she was carrying inside his/her wallet two bindles and a small baggie containing a

16   white crystalline substance believed to be methamphetamine and a small bindle containing an off-

17   white powder believed to be fentanyl. The SOI admitted to obtaining the suspected methamphetamine

18   from a Hispanic male known as "Cali" who resides on Thomas Avenue. However, the SOI could not

19   remember the address. The SOI claimed the suspected fentanyl was not a controlled substance.

20         **47.**    As mentioned earlier, MOORE also mentioned a Mexican trafficker known as

21   "Cali" who was associated with the TARGET LOCATION.

22         **48.**    Your Affiant conducted a presumptive field test of a sample taken from the

23   suspected methamphetamine found in the SOI's possession. The sample subsequently tested positive

24   for the presence of methamphetamine.

25

1

2                                    **CONCLUSION**

3              49.     Investigators believe, based upon their training and experience, they are

4    going to find controlled substances and proceeds from the sale of controlled substances,

5    specifically methamphetamine, inside the TARGET LOCATION.   Investigators know from their

6    training and experience that drug traffickers will also keep drug proceeds, cellular telephones,

7    scales, packaging materials, address books, buy/owe sheets, and other indicia that provide

8    investigators with evidence of ongoing criminal conspiracies, in addition to drugs, inside locations

9    like the TARGET LOCATION that is likely being utilized to store, package, and distribute drugs.

10   Investigators also expect to find firearms to protect the illicit drugs that this suspected source of

11   supply is distributing.

12     WHEREFORE, based on the foregoing evidence of drug trafficking from the aforementioned, I

13     respectfully request that the court issue a search warrant and sealing order for the locations

14     described in paragraph 4 and the property described in paragraph 6.  Investigators request that this

15     warrant be sealed in order to better protect the source of the information.

Christopher Cadogan
Special Agent
Drug Enforcement Administration

11

SUBSCRIBED AND SWORN TO BEFORE ME,
this _____ 8 _____ day of May, 2021.

CHELSEY M VASCURA
United States Magistrate Judge

12

## ATTACHMENT A

1      This affidavit is made to support an application for a warrant to search and seize evidence from the
2      premise commonly known as 1655 Thomas Avenue in Columbus, Ohio 43223. The premise is a
3      two-story, tan single family residence with white trim. There are two doors both painted white and
4      facing east. The northernmost door is identified by the black numerals "1655". The premise
5      located at 1655 Thomas Avenue in Columbus, Ohio 43223, will hereafter be referred to as the
6      TARGET LOCATION.

**ATTACHMENT B**

The evidence to be searched for and seized is:

A.      methamphetamine, and other controlled substances;

B.      documents and other items tending to show dominion and control over the premises, including, but not limited to, bills or other business-related documents, correspondence, photographs;

C.      documents or other items tending to identify co-conspirators and sources, including, but not limited to, letters, notes, memoranda, photographs, address and phone books, maps, organizers, or lists of names;

D.      items commonly used to facilitate drug trafficking, such as firearms, ammunition, beepers, pagers, cellular telephones, pay/owe sheets, packaging materials, "cut", scales, grinders;

E.      likely proceeds of drug trafficking, such as U.S. currency and other negotiable instruments.

F.      documents and other items tending to establish or hide the whereabouts of proceeds from drug trafficking, such as safes, keys to other locations, and financial records;